Filed 1/17/25  In re E.E. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re E.E., a Person Coming Under the Juvenile Court Law. | |
| | D084740 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| | (Super. Ct. No. J521417) |
| Plaintiff and Respondent, | |
| v. | |
| J.S., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of San Diego County, Michael P. Pulos, Judge.  Affirmed.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, Indra N. Bennett, Deputy County Counsel, for Plaintiff and Respondent.

J.S. (Father) appeals the juvenile court's dispositional order regarding his minor child, seven-year-old E.E.  He contends the juvenile court abused its discretion by including a substance abuse component and a domestic violence group for perpetrators in his case plan.  We affirm, concluding the trial court did not abuse its discretion.

FACTUAL AND PROCEDURAL BACKGROUND

A.      *Facts Leading to the Dependency Case*

In January 2024,[1] the San Diego County Health and Human Services Agency (the Agency) received a referral that E.E. disclosed Father hit her and K.E. (Mother) and then lied about it.[2]  E.E. claimed she did not feel safe at home and that she got hurt.  E.E. said Father "d[id] this every day" and that she was so scared at nighttime that she would shake.

In February, a social worker made an unannounced visit to the family home and spoke with E.E. and both parents.  Mother stated Father has a lot of anger and "blows up" almost daily, during which he calls her names and threatens to "put [her] in jail."  She acknowledged domestic violence between her and Father for the past 12 years but claimed the only time he was physically violent was 15 years ago.  E.E. then interjected that was "not true. . . [Father] yells all the time . . . [and] calls me names. I've seen [Father] hit you."

E.E. disclosed Father yells often, and the parents "fight and they throw pizza" when Mother drinks.  Father "fights" with Mother and "hit" her.  E.E. was afraid and hid under the covers "every day."

---

1      All undesignated date references are to 2024.

2      Mother is not a party to this appeal and will only be referenced when necessary.

Father told the social worker that he had to "yell and scream a lot" because E.E is a controlling child. He acknowledged daily yelling and arguing with Mother when she drank alcohol.

The social worker prepared a safety plan with the parents. The parents agreed to separate when an argument started, reduce their respective substance use, and use a code word and hand signals to communicate their need to cool off during arguments.

In mid-February, Mother was arrested after an altercation with Father when she was drunk, yelling and tried to hurt him. E.E. reported they began "fighting on the way home" from school, were cursing and "too loud." They continued to argue, yell, use more bad words, hit each other, and pull each other's hair when they arrived home. E.E. said Mother pulled Father's hair, and Father put Mother's "head in the sink." Both parents cited Mother's alcohol use as the catalyst for the fight. Mother grabbed Father's hair when he was trying to leave, hit the back of his head with "hard force" and pushed him. Mother stated she pushed Father after he pushed her. E.E. saw Mother getting arrested, and was "confused, scared, and worried."

In early May, Father called 911 to report another domestic violence incident. Once again, Mother was drunk and arrested. Father reported Mother punched him, scratched him, damaged his belongings, elbowed him, and verbally threatened to kill him. E.E. witnessed Mother throw stuff at Father and destroy household items. She told law enforcement that she saw everything, that it happened often and that she felt scared of her parents' fighting and Mother's drinking.

The social worker prepared another safety plan with Father. Father agreed to file a restraining order, keep Mother out of the home, inform the building's security team that she was not allowed in the home, call 911 if she

returned, and talk to his case manager about domestic violence resources. The next day, the social worker made an unannounced visit where she saw both parents in violation of the safety plan. Mother maintained Father was "abusive, not me," that she was acting in self-defense and had visible injuries. She stated he was always angry and was very violent when he was mad and yelling.

### B.   *The Agency's Petition and Detention Hearing*

In May, the Agency filed a petition under Welfare and Institutions Code[3] section 300, subdivision (b)(1) alleging E.E. was exposed to physical violence between her parents.

At the detention hearing, the juvenile court acknowledged Father as a presumed parent, detained E.E. out of her parents' custody and ordered separate, supervised visitation.

### C.   *The Agency's Jurisdiction/Disposition Report*

The social worker interviewed E.E. and both parents in May. E.E. reported that her parents fight, say bad words, and throw things. Mother drank and Father smoked something that looked "like candy." When her parents "fight each other," she "was shaking and scared" and there was "nowhere" she could "escape."

Mother maintained Father was physically, emotionally, and mentally abusive towards her. Father would get mad when she drank alcohol, and he would yell and "physically attack" her. Verbal arguments occurred every other day, and their arguments would turn physical about once a week. E.E. was home during these arguments. Regarding the incident in mid-February, she stated Father was "verbally attacking" her and pushing her, and she

---

[3]   All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

acted in self-defense. She claimed that "pretty much the same thing" happened in early May. She denied being the physical perpetrator during either altercation.

Father denied a history of extensive violence between him and Mother. He admitted he was arrested in 2018, but he claimed it was because Mother said a "nasty thing" to him, and he became upset. Father smoked marijuana daily for pain that stemmed from an accident that left him with a brain injury, impaired vision, a limp and restricted use of his right hand. He previously had a medical marijuana card, but it expired. Mother cared for E.E. when he was under the influence of marijuana, but he would come back and care for E.E. if Mother was drinking. He denied marijuana contributed to domestic violence.

The maternal grandmother reported that Father was "always high" and would get violent when they lived together for about a year. According to her, Father smoked marijuana "24/7," which caused him to "fight really bad for no reason." After smoking, "he would start trouble, he explodes" and became verbally and physically aggressive. On one occasion, Father once grabbed Mother by the hair, and she was yelling and screaming for the maternal grandmother. When Mother came out of the room, she was bleeding from the face.

Father was resistant to drug testing due to his concern that if he tested the Agency would make him attend substance use services. The Agency repeatedly explained they were testing for other substances and assess his ability to safely parent while using marijuana. He agreed to drug test but claimed a substance abuse specialist told him he was being "set up." When a mobile drug testing service went to Father's residence in early June, he did not answer the door or his phone.

The substance use specialist reported Father disclosed daily marijuana use that was prescribed by a doctor for pain management. They discussed alternatives to marijuana, but Father was concerned doctors were "trying to get the world addicted" to other medications. She confirmed doctors do not prescribe marijuana for pain management and advised Father that she would refer him to treatment if he completed a screening. He told her that the Agency was "trying to set him up," so she told him to speak to his attorney. They failed to complete a screening.

In mid-June, Father texted the social worker a copy of a medical marijuana card. After he was assigned to a specific provider to undergo a psychological evaluation, the social worker and case manager worked extensively with Father to schedule the evaluation and assist with transportation. Father then did not attend the evaluation as scheduled because he was not feeling well.

Father's domestic violence intake established he was appropriate for an offender's group. The provider described Father as "forthcoming, respectful and cooperative," and she acknowledged that Father identified himself as the victim and not the perpetrator. Father did not attend drug tests July and August and failed to attend a domestic violence class in July.

D. *The Contested Jurisdiction/Disposition Hearing*

The contested jurisdiction and disposition hearing took place in August. The juvenile court admitted all the Agency's reports and attachments into evidence.

Both parents requested dismissal of the petition. Father also objected to drug testing, an assessment by the substance use specialist, and a domestic violence course for perpetrators instead of victims. Father's counsel claimed there was no nexus between her client's use of marijuana and the

6

protective issues. Counsel acknowledged that the domestic violence class was "going well," but stated Father preferred a victim's class given the facts underlying the petition.

E.    *The Court's Ruling*

The juvenile court made a true finding on E.E.'s petition and ordered ongoing removal from the parents. The court ordered the case plan as proposed by the Agency. It mentioned the evidence of "long history of mutual domestic violence" that occurred in front of E.E., as well as the service provider's assessment that a group for perpetrators was appropriate for Father. Even though "the direct impetus of this petition was Mother's actions," a case plan needed to address "the entirety of [protective] issues facing the family and cannot ignore the history here."

As to substance use screening and testing, the juvenile court explained that while "the use of marijuana is legal" and it has "medicinal properties," not every legal substance can be unmonitored. The court found Father's use of marijuana was a "personal decision" that was "not being guided by a specific physician." Father's "chronic use of a substance," even if for "pain management," is "subject to abuse" and "overuse" and "needs to be assessed." Without a "medical professional" giving the court "guidance," it would be relying on Father's "own personal views." The court reiterated that it needed the involvement of "a professional" who could guide the Agency and ensure Father's use was "appropriate," a "reasonable amount," and "not taking on addictive properties" that would diminish his ability to care for E.E.

7

## DISCUSSION

## I.

### *Relevant Legal Principles*

After finding a child is within the juvenile court's jurisdiction, that court must then proceed to the dispositional phase.  (*In re N.M.* (2011) 197 Cal.App.4th 159, 169.)  At the disposition hearing, the juvenile court may " 'direct any reasonable orders to the parents' of a dependent child as the court deems necessary and proper to ensure appropriate care, supervision, custody, conduct, maintenance, and support of the child (§ 362, subd. (d))." (*In re I.R.* (2021) 61 Cal.App.5th 510, 522.)  The "juvenile court enjoys broad discretion in crafting a dispositional case plan to this end."  (*Ibid.*)  "The court's principal concern is a disposition consistent with the best interests of the minor."  (*In re Rodger H.* (1991) 228 Cal.App.3d 1174, 1183.)

In advance of the disposition hearing, the Agency must submit a case plan, and the juvenile court must consider the plan "at the initial hearing and each review hearing."  (§ 16501.1, subd. (g)(14).)  "The case plan has several components, including:  identifying the reasons for dependency (§ 16501.1, subd. (g)(3)); setting forth specific goals and describing why planned services are appropriate to meet those goals (§ 16501.1, subd. (g)(2)); and describing the services to be provided to assist in reunification (§ 16501.1, subd. (g)(10))."  (*In re M.R.* (2020) 48 Cal.App.5th 412, 423, fn. omitted.)  The case plan is intended to ensure "that services are provided to the child and parents or other caretakers . . . in order to improve conditions in the parent's home, to facilitate the safe return of the child to a safe home or the permanent placement of the child, and to address the needs of the child while in foster care."  (§16501.1, subd. (a)(2).)

"We review the juvenile court's disposition case plan for an abuse of discretion." (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1071.) "A court exceeds the limits of legal discretion if its determination is arbitrary, capricious[,] or patently absurd. The appropriate test is whether the court exceeded the bounds of reason." (*In re L.W.* (2019) 32 Cal.App.5th 840, 851.) We note, however, there are some cases that have applied the substantial evidence standard of review to the juvenile court's dispositional orders, and others that have combined this standard with the abuse of discretion standard. (See *In re T.M.* (2016) 4 Cal.App.5th 1214, 1219.) While in the instant matter we apply the abuse of discretion standard, we would reach the same result under either approach.

As part of its disposition case plan, the juvenile court may require a parent to participate in a counseling or education program. (§ 362, subd. (d).) The program in which the parent is required to participate "shall be designed to eliminate those conditions" that led to dependency. (*Ibid.*) However, "the juvenile court is not limited to the content of the sustained petition" when it determines the dispositional orders that would best serve the children's interests. (*In re Briana V.* (2015) 236 Cal.App.4th 297, 311 (*Briana V.*).) "In fact, there need not be a jurisdictional finding as to the particular parent upon whom the court imposes a dispositional order." (*Ibid.*) Rather, the juvenile court should consider the "evidence as a whole" when crafting its dispositional orders. (*Ibid.*)

## II.

### *The Court Acted Within Its Discretion*

Father contends that the juvenile court did not have sufficient basis to order him to participate in a domestic violence group for perpetrators instead of victims, to undertake substance abuse testing and to participate in

substance abuse services, if recommended, by a substance abuse specialist. We disagree.

A.    *Domestic Violence Group for Perpetrators*

A review of the record confirms that the parents had an extensive history of domestic violence. The Agency's investigation started with E.E.'s disclosures that Father was mean to her and hit her and Mother. When E.E. overheard Mother state that Father had only been physically violent on one occasion, E.E. interjected: "That's not true. He yells. He yells all the time. He calls me names. I've seen Dad hit you." Regarding the February incident, E.E. reported her parents hit each other and pulled each other's hair when they arrived home. When asked for details, E.E. said Mother pulled Father's hair, and Father "put mom's head in the sink." There was another incident in May where E.E. was scared by her parents' fighting. Mother maintained Father was "abusive, not me," that she was acting in self-defense and had visible injuries. She stated he was always angry and was very violent when he was mad and yelling.

Mother repeatedly stated Father was abusive towards her. Even though Father never admitted to physical violence, he admitted he argued daily with Mother and yelled and screamed often. The maternal grandmother described Father as violent, explosive and aggressive. On one occasion, she saw Mother bleeding after Father grabbed her by the hair. E.E.'s school principal also described an occasion when Mother appeared scared and verbalized extreme fear of Father. Substantial evidence supports the juvenile court's factual finding that the domestic violence was mutual.

Although Father denies that he pushed Mother or caused the domestic violence, this Court cannot "reweigh the evidence, evaluate the credibility of witnesses or resolve evidentiary conflicts." (*In re D.B.* (2018) 26 Cal.App.5th

10

320, 328.)  On the contrary, we are required to " 'consider all the evidence, draw all reasonable inferences, and resolve all evidentiary conflicts, in a light most favorable to the trial court's ruling.' "  (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.)

Father also is critical of the doctor's written intake assessment, but that form was based largely on his input, including his belief that he was the victim even though "[Mother] and her family have been saying [he has] been abusive for 14 years."  If the doctor had determined Father was not appropriate for a domestic violence offender group, she could have noted that and explained her reasoning on the form.

Finally, Father suggests a group for perpetrators was inappropriate because he was oftentimes victimized by Mother and acknowledged the violence was harmful to E.E.  However, just because Mother may have been the primary perpetrator does not mean Father is exclusively a victim.  Case plans address a family's unique needs to reunify, even if the petition does not articulate every protective issue or all the facts that place a minor at risk. (See *Briana V.*, *supra*, 236 Cal.App.4th at pp. 311-312.) This aligns with the juvenile court's broad discretion in drafting dispositional orders that consider a parent's past conduct and further a minor's best interest.  (*In re S.O.* (2002) 103 Cal.App.4th 453, 461; *In re Nada R.* (2001) 89 Cal.App.4th 1166, 1179.)

We conclude that the court reasonably exercised its discretion to require Father to participate in a domestic violence group for perpetrators.

B.     *Substance Use Specialist and Drug Test*

Father argues that substantial evidence does not support the substance use components of his case plan.  We disagree.

Relying solely on a medical marijuana card, Father claims drug testing and a screening were unwarranted because he "already had his pain assessed

11

by a doctor who prescribed medical marijuana" and provided recommendations. However, the medical marijuana card is illegible. There is no evidence in the record Father was examined by a doctor who prescribed marijuana while aware of his traumatic brain injury and other impairments. The record does not indicate he consulted with a physician about a treatment plan, specific dosages or alternatives. On the contrary, Father told the social worker that he had not seen a doctor to discuss alternatives to marijuana because he did not trust doctors.

Additionally, Father's behavior during visits raised red flags about his forgetfulness, his protective capacity, and his marijuana use. He missed one visit entirely and was late to other visits. At a park, he became hostile towards a child due to his mistaken belief that the child knocked E.E. off playground equipment. On another occasion, while Father was being observed by two social workers, he chose to disregard traffic signals and walk across trolley tracks with E.E. even though bells and flashing lights indicated a trolley was approaching. He admitted using marijuana just prior to a visit during his child and family team meeting.

As such, Father's chronic marijuana use was a valid concern considering his impairments and the lack of medical oversight. He used marijuana multiple times per day, every day, and he seemed dependent upon it. It was within the juvenile court's broad discretion to order a case plan that attempted to "make sure that the substance use is consistently of a reasonable amount and not taking on addictive properties that will result in diminished capacity to care for the minor."

## DISPOSITION

The juvenile court's findings and orders of August 9, 2024, are affirmed.


O'ROURKE, Acting P. J.

WE CONCUR:


DATO, J.


CASTILLO, J.